UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
ROBERTO TORRES,               :
                              :   HONORABLE JOSEPH E. IRENAS
        Plaintiff,            :   CIVIL ACTION NO. 04-3793
                              :
     v.                       :       OPINION
                              :
LUCCA'S BAKERY, OSHIKIRI      :
CORPORATION OF AMERICA, and   :
GEMINI BAKERY EQUIPMENT       :
COMPANY,                      :
                              :
        Defendants.           :
```

**APPEARANCES:**

LAW OFFICES OF THOMAS MORE HOLLAND
By:  Thomas More Holland, Esq.
1522 Locust Street
Philadelphia, PA 19102
          Counsel for Plaintiff

MARGOLIS EDELSTEIN
By:  Colleen M. Ready, Esq.
     Ian M. Sirota, Esq.
216 Haddon Avenue, Suite 200
P.O. Box 2222
Westmont, NJ 08108
          Counsel for Defendant Lucca's Bakery

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
By:  David F. White, Esq.
     Adam M. Sorce, Esq.
620 W. Germantown Pike, Suite 350
Plymouth Meeting, PA 19462
          Counsel for Defendant Oshikiri Corporation of
          America

SALMON, RICCHEZZA, SINGER & TURCHI LLP
By:  Timothy J. Schipske, Esq.
Woodcrest Pavilion
10 Melrose Avenue, Suite 450
Cherry Hill, NJ 08003
          Counsel for Defendant Gemini Bakery Equipment
          Company

**IRENAS**, Senior District Judge:

Plaintiff, Roberto Torres, brings this personal injury / product liability suit against his former employer, Lucca's Bakery, and the distributor and manufacturer of the bakery equipment that severely injured him, Gemini Bakery Equipment Company ("Gemini") and Oshikiri Corporation of America ("Oshikiri"), respectively.  Before the Court are each Defendant's Motion for Summary Judgment.[1]


# I.

Lucca's Bakery is a family-owned and operated commercial bakery located in Winslow, New Jersey.  In July 2002, Anthony Lucca hired Torres to prepare bread dough.  While at work on August 9, 2002, Torres gravely injured his right arm when it became caught in a machine used to prepare dough.

Torres and another employee, George Crowder, were stationed at a machine identified as "Oshikiri Model 'MG-1' (32") Roll Line."  (Pl. Ex. Y)  The machine prepares raw bread dough into individual unbaked rolls that are deposited onto 18 by 26 inch wooden boards (several rolls to a board) and then transported down a conveyor belt.  (Pl. Exs. H, J; Def. Lucca's Bakery Ex. S; A. Lucca Dep. Tr. at p. 34-37; Crowder Dep. Tr. at p. 18-21)  At the end of the conveyor, a person manually picks up the boards

---

[1]  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

carrying the rolls and places the boards in racks. (Id.)  The boards are approximately one to three inches apart from each other as they move along the conveyor belt.  (Pl. Exs. H; M. Lucca Dep. Tr. at p. 16; Torres Dep. Tr. at p. 50)  The conveyor does not run continuously; it runs in cycles, stopping for approximately four seconds before moving each board along.  (Pl. Ex. H, J; Crowder Dep. Tr. at p. 26)

Importantly, the conveyor is made up of two parallel chains and metal cross bars, called "flights," forming a ladder configuration (i.e., the flights correspond to the rungs of the ladder). (Pl. Ex. H, I)  The flights are 28 inches apart.  (Def. Gemini's Ex. K at p. 2)  Between the flights is open space where one can see directly to the floor below.  (Pl. Ex. H; Def. Lucca's Bakery Ex. S)  The conveyor is advanced forward by a "tail pulley" mechanism at the end of the conveyor line.  (Pl. Exs. H, I; Def. Lucca's Bakery Ex. S)  The wooden boards rest on the flights as they are propelled forward by the pulley mechanism moving the chains.

On the day of the accident, Torres was standing next to the conveyor.  He arranged by hand the unbaked rolls that were deposited onto the boards as the boards moved along the conveyor. (Crowder Dep. Tr. at p. 9-12, 18-21; Torres Dep. Tr. at p. 23-24, 49-51)  Crowder was standing at the end of the conveyor to pick up the boards and load them onto racks for baking. (Crowder Dep. Tr. at p. 18; Torres Dep. Tr. at p. 51)  Torres was still a new

3

employee at the time, and the parties do not dispute that he had only worked with the machine three to five times before. (Torres Dep. Tr. at p. 22)  Torres and Crowder were the only people in the room.

Torres testified that he could not remember how he was injured, as it happened very quickly. (Torres Dep. Tr. at p. 29, 52).  Crowder testified that he saw Torres repeatedly reaching his hand and arm through the open spaces between the conveyor flights to pick up pieces of dough that had fallen to the floor below. (Crowder Dep. Tr. at 24)  Torres flatly denies ever reaching into the machine. (Torres Dep. Tr. at 43)

There is no direct evidence in the record as to how Torres' arm initially came in contact with the machine.  One of Torres' experts testified that he inferred from examining the machine and the location of Torres' injuries that Torres' forearm was the first point of contact with the machine. (Clauser 1/26/07 Dep. Tr. at p. 81)  Clauser's report also explains:

> Examination of the conveyor and Mr. Torres's arm together with descriptions of the incident by Mr. Torres and his employer made during my inspection show that he was injured when his arm was trapped between the conveyor flight and the tail pulley shaft. When the conveyor automatically advanced, the flight initially moved horizontally toward the discharge end of the conveyor. In doing so the flight contacted Mr. Torres's arm and moved it toward and against the shaft of the tail pulley. As the flight traveled around the tail pulley with the conveyor it pulled Mr. Torres's shoulder downward. His upper arm then contacted a fixed cross member in the conveyor frame located on the top surface beyond the tail pulley. At this point the moving cross flight imposed a three point bending

4

load on Mr. Torres's arm and severely injured it.

(Pl. Ex. I)  Torres suffered a near amputation of his arm in the accident and endured several surgeries afterwards.  (Pl. Exs. G, N)  One of the doctors who examined him concluded that he has "for all practical intent and purposes, lost the use of his right arm."  (Pl. Ex. G)

Because of the accident, Torres now receives workers' compensation benefits.  (Torres Dep. Tr. at 14)

The Complaint asserts one tort claim against Lucca's Bakery, essentially alleging that Lucca's Bakery committed an "intentional wrong," which resulted in Torres' injury (Count I of the Complaint).[2]  The Complaint also alleges product liability claims against Oshikiri, the manufacturer of the machine, asserting negligence (Count II); strict liability (Count III); and breach of implied warranties of merchantability and fitness (Count IV).  These same claims are also advanced against Gemini, the distributor of the machine (Counts V, VI and VII).

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[2]  As fully discussed *infra*, only claims based on an employer's alleged "intentional wrong" are exempted from the workers compensation bar established by N.J.S.A. § 34:15-8.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56©)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).   The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

### A.

Lucca's Bakery moves for summary judgment, asserting that Torres' claim is barred by New Jersey's Workers' Compensation Act, N.J.S.A. § 34:15-8, which states,

> . . . If an injury or death is compensable under
> this article, a person shall not be liable to

6

anyone at common law or otherwise on account of
such injury or death for any act or omission
occurring while such person was in the same employ
as the person injured or killed, *except for
intentional wrong.*

(emphasis added).

The New Jersey Supreme Court has provided specific guidance

on how to approach this issue:

> [W]hen an employee sues an employer for an intentional
> tort and the employer moves for summary judgment based
> on the Workers' Compensation bar, the trial court must
> make two separate inquiries.  The first is whether,
> when viewed in a light most favorable to the employee,
> the evidence could lead a jury to conclude that the
> employer acted with knowledge that it was
> substantially certain that a worker would suffer
> injury.  If that question is answered affirmatively,
> the trial court must then determine whether, if the
> employee's allegations are proved, they constitute a
> simple fact of industrial life or are outside the
> purview of the conditions the Legislature could have
> intended to immunize under the Workers' Compensation
> bar.  Resolving whether the context prong . . . is met
> is solely a judicial function.  Thus, if the
> substantial certainty standard presents a jury
> question and if the court concludes that the
> employee's allegations, if proved, would meet the
> context prong, the employer's motion for summary
> judgment should be denied; if not, it should be
> granted.

*Laidlow v. Hariton Machinery Co., Inc.*, 170 N.J. 602, 623

(2002).[3]  The two prongs of the analysis are generally referred

to as the "conduct" and "context" prongs respectively.  *Crippen*,

176 N.J. at 408.  The Court's disposition must be "grounded in

---

[3]  *See also Crippen v. Central Jersey Concrete Pipe Co.,* 176 N.J. 397,
408-09 (2003)(applying *Laidlow*); *Mull v. Zeta Consumer Products*, 176 N.J. 385,
391 (2003)(applying *Laidlow*); *Tomeo v. Thomas Whitesell Construction Co.,* 176
N.J. 366, 373 (2003) (applying *Laidlow*).

the totality of the facts contained in the record." *Laidlow*, 170 N.J. at 623.

Viewing the disputed facts in the light most favorable to Torres, he has not put forth sufficient evidence from which a reasonable juror could conclude that Lucca's Bakery acted with knowledge that it was substantially certain that Torres would be injured.  The machine was purchased in 1994.  Between that date and 2002, when Torres was injured, only two other employees[4] suffered relatively minor injuries on the machine.  Sometime between 1996 and 1998, Patrick DeVries suffered "just cuts and bruises" on his arm after he intentionally reached down between the conveyor flights.  (DeVries Dep. Tr. at 10-11)[5]  In 1998, Geraldo Reyes also injured his arm when he slipped and fell into the machine.[6]  (Pl's Ex. E)  Reyes broke his left arm and required a cast.  (Id.)[7]

---

[4]  The parties dispute whether one of the two people injured was an employee.  Patrick DeVries testified that he was an employee for approximately five months when he was 15 or 16 years old.  (DeVries Dep. Tr. at 7) He also testified that he never completed any paperwork and was paid in cash for working one day a week (Id. at 9, 27).  Witnesses for Lucca's Bakery deny that DeVries was ever an employee.  Torres argues that this evidence establishes that Lucca's Bakery intentionally hired DeVries "off the books" to keep the number of employees below the number which triggers injury reporting obligations under OSHA regulations.  However, no reasonable fact finder could reach such a conclusion based on this evidence.

[5]  DeVries' medical diagnosis was "a relatively benign soft tissue injury which should resolve on its own."  (Pl's Ex. B)

[6]  Conflicting evidence in the record raises a question about whether Reyes was injured by the Roll Line or a mixer.  For the purposes of this motion, the Court resolves the conflict in favor of Torres and will assume that Reyes was injured by the Roll Line conveyor.

[7]  A year after his accident, Reyes only complained of "discomfort" when lifting heavy objects with his left arm.  (Pl's Ex. E)

Torres has also put forth evidence that Lucca's Bakery failed to train him, and specifically failed to instruct him in Spanish (the only language in which he is fluent) how to properly use the machine. (See Def. Lucca's Bakery Ex. P; Torres Dep. Tr. at 29-31, 34, 45)  This evidence, however, even when considered in light of the two previous injuries, cannot support the conclusion that Lucca's Bakery acted with knowledge that Torres' injury was substantially certain to happen.  "[S]ubstantial certainty needs to be 'virtual certainty.'"  *Tomeo*, 176 N.J. at 371 (quoting *Millison v. E.I. duPont de Nemours & Co.*, 101 N.J. 161, 178 (1985)).  Even acting with an appreciation that the risk of harm to another is great-- a conclusion which could not be supported by these facts alone-- is not the requisite level of "intent" to impose liability under the Worker's Compensation statute.  *Id.*  Accordingly, summary judgment will be granted to Lucca's Bakery.

**B.**

Before turning to the merits of Gemini's and Oshikiri's Motions, a choice of law analysis is warranted.  Torres asserts that Pennsylvania law should govern his product liability claims, while Gemini and Oshikiri assert that New Jersey law should

apply.[8]

Sitting in diversity, this Court applies the choice of law provisions of New Jersey. *Woessner v. Air Liquide, Inc.,* 242 F.3d 469, 472 (3d Cir. 2001). New Jersey courts apply the governmental-interest analysis: (1) determine whether a conflict exists between the laws of the interested states and (2) identify the governmental policies underlying each law and examine how those policies are affected by each state's contacts to the litigation and to the parties. *Id.* (citing *Veazey v. Doremus*, 103 N.J. 244 (1986)).

A clear conflict exists between the product liability laws of New Jersey and Pennsylvania. Pennsylvania law allows negligence and breach of warranty claims, but New Jersey only allows one statutory cause of action for strict liability. *Compare* N.J.S.A. § 2A:58-C2; *Green v. General Motors Corp.,* 310 N.J. Super. 507, 517 (App. Div. 1998)("Under the New Jersey Products Liability Act . . . the causes of action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action, the essence of which is strict liability.");[9] *Oquendo v. Bettcher Indust., Inc.,* 939

---

[8] Torres raises the choice of law question in a footnote. While not explicit, Torres apparently asserts that Pennsylvania law should govern because both Oshikiri and Gemini have principal places of business in Pennsylvania. Torres also asserts that the machine was designed in Pennsylvania, and there is some evidence in the record to support that inference. (Kobayashi Dep. Tr. at 15, 28)

[9] *Cert. denied,* 156 N.J. 381 (1998).

F. Supp. 357, 361 (D.N.J. 1996),[10] *with* 13 Pa. Cons. Stat. §§ 2314, 2315 (creating causes of action for breach of implied warranties); *Soufflas v. Zimmer*, 474 F. Supp. 2d 737, 751-54 (E.D. Pa. 2007)(discussing product liability claims based on implied warranties and negligence under Pennsylvania law).[11] "When dealing with liability based on negligence, strict liability, products liability or the like, differing rules as to liability or damages generally represent genuine conflicts since the laws covering these issues take into account both the needs of the injured plaintiffs and the economic viability of the defendants." *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 548 (D.N.J. 1998)(Irenas, J.).  Accordingly, a conflict exists and the Court proceeds to examine the policies underlying the laws and the state contacts.

The policies underlying both Pennsylvania and New Jersey law are generally the same: both states seek to compensate people injured by defective products and regulate the conduct of manufacturers and distributors (i.e., ensure production of safe products) within the state.  In this case, Pennsylvania's policy of ensuring that safe products are designed and placed in the

---

[10] *Aff'd without opinion*, 118 F.3d 1577 (3d Cir. 1997).

[11] *See also Williams v. Terex-Telelect, Inc.*, No. 01-3770, 2003 U.S. Dist. LEXIS 9733 at *5 (E.D. Pa. May 19, 2003)(holding a conflict exists between New Jersey and Pennsylvania product liability laws); *Kenney v. Deere & Co.*, No. 98-602, 2000 U.S. Dist. LEXIS 2530 at *6 (E.D. Pa. March 8, 2000)(same); *Schmidt v. Duo-Fast, Inc.*, No. 94-6541, 1995 U.S. Dist. LEXIS 9720 at *2-3 (E.D. Pa. July 11, 1995)(same).

stream of commerce in the state would be furthered by applying Pennsylvania law.  On the other hand, New Jersey's policy of compensating those residing and injured in the state, by products located in the state, would be furthered by applying New Jersey law.  Thus, each state has some stake in the application of its law to this case.

The quality of contacts with New Jersey, however, leads the Court to conclude that New Jersey's interest is stronger than Pennsylvania's.  At the time of the accident, Torres lived in New Jersey[12] and was employed by a company located in New Jersey. The allegedly defective product was shipped to New Jersey, installed and used in New Jersey, and the accident occurred in New Jersey.  As a result of the accident, New Jersey now pays worker compensation benefits to Torres.  These contacts outweigh Pennsylvania's interest in ensuring that Gemini and Oshikiri, companies doing business within Pennsylvania, design and distribute safe products.  *See Giovanetti v. Johns-Manville Corp.*, 539 A.2d 871, 873 (Pa. Super. Ct. 1988)(holding that New Jersey law applied to product liability suit, reasoning that while "Pennsylvania can certainly be viewed as possessing a legitimate interest in ensuring that Pennsylvania companies do not manufacture or distribute hazardous products . . . that interest is clearly eclipsed by the numerous contacts with New

---

[12]  After the accident Torres moved back to Puerto Rico, where he had lived prior to living in New Jersey.

Jersey" including the fact that Plaintiff, a New Jersey resident, was injured on the job in New Jersey).

New Jersey law applies to Torres' product liability claims.[13]

### C.

Gemini asserts that summary judgment in its favor is warranted because it merely sold the Oshikiri Roll Line and did not create the alleged defect, was not aware of the alleged defect, and exercised no control over the design, manufacturing or labeling of the product, therefore liability is precluded by N.J.S.A. § 2A:58C-9.  Torres asserts that disputed issues of material fact preclude summary judgment.

N.J.S.A. § 2A:58C-9 provides:

a. In any product liability action against a product seller,[14] the product seller may file an affidavit

_____

[13]  Because as discussed *supra*, New Jersey law does not recognize product liability claims of negligence or breach of implied warranties, summary judgment will be granted to Gemini and Oshikiri on those claims (Counts II, IV, V, and VII).  *See Oquendo*, 939 F. Supp. at 361.  In any event, Torres' arguments in opposition to the present motions appear only to assert claims based on theories of failure to warn and design defect, both of which are cognizable under New Jersey's statute.  *See* N.J.S.A. § 2a:58C-2 ("A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.").

[14]  "'Product seller' means any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in

certifying the correct identity of the manufacturer of the product which allegedly caused the injury, death or damage.

b. Upon filing the affidavit pursuant to subsection a. of this section, the product seller shall be relieved of all strict liability claims, subject to the provisions set forth in subsection d. of this section. Due diligence shall be exercised in providing the plaintiff with the correct identity of the manufacturer or manufacturers.

. . .

d. A product seller shall be liable if:

(1) The product seller has exercised some significant control over the design, manufacture, packaging or labeling of the product relative to the alleged defect in the product which caused the injury, death or damage; or

(2) The product seller knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage; or

(3) The product seller created the defect in the product which caused the injury, death or damage.

Pursuant to § 2A:58C-9(a), Gemini submits the affidavit of

Mark Rosenberg, Gemini's CEO, identifying Oshikiri as the

---

the line of commerce." N.J.S.A. § 2A:58C-8. "'Manufacturer' means (1) any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product; (2) a product seller with respect to a given product to the extent the product seller designs, formulates, produces, creates, makes, packages, labels or constructs the product before its sale; (3) any product seller not described in paragraph (2) which holds itself out as a manufacturer to the user of the product; or (4) a United States domestic sales subsidiary of a foreign manufacturer if the foreign manufacturer has a controlling interest in the domestic sales subsidiary." Id. It is undisputed that Gemini is a product seller and Oshikiri is a manufacturer.

designer and manufacturer of the Roll Line machine.  (Def. Gemini's Ex. A)  Additionally, Oshikiri admits that it manufactured and designed the machine.  Accordingly, Gemini may only be liable under the circumstances set out in § 2A:58C-9(d).

Torres asserts theories of design defect and failure to give adequate warnings.  The issue at the present time is whether Torres has put forth sufficient evidence that Gemini either: (1) exercised some significant control over the design or labeling of the Roll Line relative to the conveyor flights; (2) knew, should have known, or possessed facts from which a reasonable seller would conclude that Gemini knew or should have known of the alleged design defect or inadequate warnings; or (3) created the alleged defect.

Torres relies upon various pieces of evidence in the record which he claims support the conclusion that Gemini exercised significant control over the design of the Roll Line.  However, much of his evidence cannot reasonably support his conclusions or is largely irrelevant to the precise issue before the Court.

First, both sides rely on the testimony of Oshikiri's representative, Michael Montgomery, who testified pursuant to Fed. R. Civ. P. 30(b)(6).  Montgomery explained the relationship between Oshikiri, Gemini and Lucca's Bakery:

> Q:  Okay. Now, do you know how this particular board feeder was manufactured?
>
> A.  Gemini Bakery, who was the sales contact, would have contacted us [i.e., Oshikiri] saying we

have a customer that is interested in a piece of equipment you make.  At that point in time, they would have gotten the specifications, you know, more detailed information from the customer, then Gemini would have in turn given us those specifications.

And assuming all parties agreed on the sale price -- again, our customer is Gemini so I-- we were-- Oshikiri Corporation of America sells its product to Gemini.  So assuming Gemini agrees with our selling price to them, they supply us with the customer-requested specifications for our particular product, and then we will manufacture that product based on those specifications given to us by Gemini.

Q:  Now, do these specifications that are provided to you, Oshikiri, from Gemini include measurements?

A:  Yes.

Q:  Okay. Are you telling me that as far as you know Oshikiri representatives did not confirm the measurements data provided?

A:  We built based on the specifications supplied to us by Gemini.

Q:  Other than measurements, what are the specifications in the manufacturing process ordinarily in the course of Oshikiri's business?

A:  Based on the customer requirements, you know, the type of dough, the number of pieces he wants to produce in a minute, these are all variables which will affect the overall product.  You have a base product that is -- that is then, you know, adjusted or modified based on customer request.

Q:  Customer being Gemini?

A:  Well, no.  I should say in case Lucca's -- Lucca would tell Gemini this is the type of product we produce, this is the number of pieces we want to produce every, you know, every minute, this is the dough consistency, those types of things.  Then Gemini makes a determination based on what Lucca gives them as to what type of machinery would be required to perform this.  Once Gemini makes that determination, they would then come to us and say--

Q:  They being Gemini?

A:  Gemini would come to Oshikiri Corp. of America and say we have a customer who has these requirements.  We want this piece of equipment.  And then they would  give us, they would give Oshikiri Corporation of America, the similar specifications that were given to them from Lucca's.

(Montgomery Dep. Tr. at p. 44-46)

Torres focuses on the portion of Montgomery's testimony that indicates that Gemini was more than just a conduit of information coming from Lucca's Bakery to Oshikiri.  Specifically, Torres asserts that Gemini processed the information given to it by Lucca's Bakery, made judgments about the precise specifications Lucca's machine would have, and then conveyed that information to Oshikiri.  Torres concludes that such processing and decision-making by Gemini is tantamount to designing the machine.

There is other evidence in the record that, when viewed in the light most favorable to Torres, generally supports his assertion that Gemini was more than just a passive conduit of information.  For example, Gemini created a schematic drawing of the machine Lucca's Bakery required, which specified the basic dimensions of the machine, (see Pl's Ex. Z), included those specifications in the purchase orders Gemini sent to Oshikiri, and then installed the machine within the space available at Lucca's Bakery.  (Savukinas Dep. Tr. at p. 144, 204; Pl's Ex. AA) It was also Gemini's responsibility to ensure that Oshikiri's machine worked in an integrated system with other machines, some

17

manufactured by other companies, all of which Lucca's Bakery used to make its baked goods. (Rosenberg Dep. Tr. at 61, 63)

Lastly, Torres relies on an email to OSHA's regional office sent by Oshikiri's General Manager of Operations, Anthony Savukinas, in connection with OSHA's investigation of the accident at Lucca's Bakery. The email indicates that Oshikiri manufactured the Roll Line and sold it to Gemini, which shipped it to Lucca's Bakery. (Pl's Ex. T) The email also states, "The purchase order to Oshikiri Corporation of America did not specify any ANSI manufacturing standard,[15] nor was it built per ANSI standard." (Id.) Torres reasons that because the purchase order was created by Gemini, and it did not contain a specification that ANSI standards should be followed, a reasonable juror could infer that it was Gemini's responsibility to designate whether or not certain safety standards should be followed.

With respect to the evidence that Gemini determined the overall dimensions of the machine and the integration of the machine with Lucca's other bakery equipment, this evidence is insufficient to establish the crucial issue: that Gemini exercised some significant control over the design of the Roll Line *relative to the conveyor flights or on-off switch*. The statute is specific. A product seller is liable if it "has exercised some significant control over the design . . . of the

---

[15] Torres' expert, Mr. Clauser, states that "ANSI" standards are safety standards used as guidelines in the bakery equipment manufacturing industry. (Pl's Ex. I)

product *relative to the alleged defect in the product which
caused the injury.*" N.J.S.A. § 2A:58C-9(d)(emphasis added).
While Gemini may well have been more than a mere conduit of
information, that alone does not establish the requisite control
over the specific design now alleged to be defective.

Torres, through the extensive reports of his expert, asserts
that his injury was caused by a defect in the design of the
conveyor flights. Specifically, Mr. Clauser opines that

> Mr. Torres was injured when the subject conveyor
> advanced while his arm was through the upper plane of
> the conveyor and a flight that was moving with the
> conveyor pinched and sheared his arm against the tail
> pulley shaft. This incident occurred because the
> conveyor was defectively designed such that it
> incorporated an unnecessary pinch/shear hazard which
> could have been eliminated by a design change without
> affecting the utility of the conveyor.

(Pl's Ex. I at p. 3) Mr. Clauser further explains that the
flights also could have been shielded. (Id. at p. 4)

Likewise, Plaintiff's other expert, Dr. Wilcox, opines that
a guard for the conveyor flights is necessary and that the on-off
switch should have been located within Torres' reach. (Pl's Ex.
M; Wilcox Dep. Tr. at p. 61)

The evidence regarding Gemini's involvement in the dimension
specifications for the machine as a whole, and the machine's
integration with other machines, is insufficient evidence of any
involvement-- much less "significant control"-- by Gemini in
designing the conveyor and flights or the location of the on-off

switch.[16]  Nothing in the record, for example, suggests that
Gemini contributed to a decision about the placement of the
flights or whether the flights should be shielded.  The only
evidence in the record demonstrates that Oshikiri's engineers
designed the conveyor and flights.[17]  There is also no evidence
in the record that Gemini contributed to a decision regarding the
placement of the on-off switch.

Nor does the email from Mr. Savukinas support a reasonable
finding that Gemini had control over the design of safety
features.  The mere facts that the purchase order came from
Gemini and that the purchase order said nothing about ANSI
standards cannot support a reasonable inference that it was
Gemini's decision not to design the machine according to ANSI
standards.  Indeed, Savukinas' testimony regarding the email
clearly indicates that Oshikiri determined which safety standards
were followed:

> I went to Mr. Kobayashi [head engineer at the time]
> and I asked him if these products were designed per
> any ANSI code, and he told me what's he's told me in
> the past, that they're built per Oshikiri code and

---

[16]  Similarly, the Court cannot attach any significant weight to
Oshikiri's responses to Torres' requests for admissions.  Oshikiri admitted
that "Defendant Gemini participated in the design of the board feeder."  (Pl's
Ex. W)  The admission is too vague to support a conclusion that Gemini
participated in the design of the conveyor and flights or the on-off switch,
especially in light of the record as a whole.

[17]  *See* Kobayashi Dep. Tr. at 66, 207-09 ("Q: Is it your testimony that
Oshikiri Corporation configured the flights based on historic size usage in
prior production [for other customers]?  A: Yes."; "Q: In 1994 when the
machine [for Lucca's Bakery] was designed and built and manufactured by
Oshikiri according to industry standard who was responsible for the design and
implementation of safety devices or warning labels?  A: Oshikiri, that's me.")

> they're built per the JIC. . . . And I asked him is
> that-- well, what is the JIC code like, what's it
> equivalent to here in the United States, and he said
> ASME.  I said, okay, then I guess it's not built
> toward ANSI, and I'll answer that way, and that's
> how I answered the letter, no, it's not built per
> ANSI code.

(Savukinas Dep. Tr. at 95)[18]

Accordingly, Torres has failed to sustain his summary judgment burden with respect to Gemini's alleged control over the design of the conveyor flights or on-off switch.

Torres has similarly failed to adduce sufficient evidence with respect to his inadequate warning theory.  Though not raised in his brief, at oral argument Torres asserted for the first time that Gemini, by virtue of creating the schematic drawings; drafting the purchase order; installing the machine; and during the installation, providing some guidance as to how to operate the machine; assumed a special duty to warn.  In support of his argument, Torres relies upon *Calderon v. Machinenfabriek Bollegraaf Appingedam, BV*, 285 N.J. Super. 623 (App. Div. 1995). In that case, the Appellate Division held that the trial court erred in not submitting to the jury plaintiff's failure to warn claim against a "servicing distributor" on the basis of a special, independent duty that arose from the servicing

---

[18]   Gemini notes that the full "name" of ANSI standards, as indicated by Torres' own expert, is "ASME/ANSI." (Pls' Ex. I)  Thus, notwithstanding Savukinas' email, it may be that the Roll Line was designed according to guidelines equivalent to "ANSI code," however, resolving this factual issue is not necessary to the disposition of Gemini's Motion.  Moreover, issues of material fact exist as to whether ANSI standards applied to the machine at the time it was manufactured.

relationship.  The Appellate Division reasoned that the evidence could have supported such a claim because the distributor of the allegedly defective machine also serviced, on more than twenty occasions, the specific part of the machine that injured the plaintiff.  *Calderon,* 285 N.J. Super. at 627, 630.  Furthermore, the servicing distributor's representative testified that it was the company's "policy" to inform the machine owners by certified mail of dangerous conditions observed by one of their service employees.  *Id.* at 630.

Torres' case is readily distinguishable.  Nothing in the record suggests that Gemini ever repaired the Roll Line, and no reasonable juror could make such an inference based on Gemini's initial installation of the machine.  The record is also devoid of any evidence that Gemini had a policy of informing its customers of unsafe conditions it observed.  The record only supports one reasonable conclusion: Gemini was merely a distributor, not a "servicing distributor" as in *Calderon;* therefore, no special duty to warn exists.

Torres' argument with regard to subsections (d)(2) and (3) also fails.  Torres argues, "[b]y choosing not to design the product pursuant to ANSI standards, Defendant Gemini knew, or should have known that the board conveyor system would be unsafe. As Defendant Gemini was the party responsible for specifying safety standards to the board system, raising [sic] the genuine issue of material fact of whether Defendant Gemini is responsible

22

for creating the defect."  (Pl's Opposition Brief at p. 13)  As

explained *supra*, the record evidence does not support a

reasonable inference that Gemini was responsible for compliance

with design safety standards.

Torres has failed to put forth sufficient evidence of

Gemini's liability pursuant to N.J.S.A. § 2A:58C-9.  Summary

judgment will be granted to Gemini.


**D.**

Finally, Oshikiri seeks summary judgment asserting that

Torres has failed to establish a prima facie case under either a

design defect theory or inadequate warning theory.

N.J.S.A. § 2A:58C-2 provides,

> A manufacturer or seller of a product shall be liable
> in a product liability action only if the claimant
> proves by a preponderance of the evidence that the
> product causing the harm was not reasonably fit,
> suitable or safe for its intended purpose because it:
> a. deviated from the design specifications, formulae,
> or performance standards of the manufacturer or from
> otherwise identical units manufactured to the same
> manufacturing specifications or formulae, or b. failed
> to contain adequate warnings or instructions, or c.
> was designed in a defective manner.

Thus, whether proceeding under a design defect theory or

inadequate warning theory, a plaintiff must establish that "the

product causing the harm was not reasonably fit, suitable or safe

for its intended purpose."  Id.; *see also, Fabian v. Minster*

*Machine Co., Inc.*, 258 N.J. Super 261, 273 (App. Div.

1992)("Whether the defect is in the design or due to a lack of

warning, unless an absolute defense is interposed, reasonableness is the prime factor in determining liability.").

In a design defect case, New Jersey courts employ a "risk-utility analysis" to determine whether a product was not reasonably safe. *Lewis v. American Cyanamid Co.*, 155 N.J. 544, 568 (1998); *Johansen v. Makita U.S.A.*, 128 N.J. 86, 95 (1992). Very often this analysis requires a plaintiff to prove that "a practical and feasible alternative design existed that would have reduced or prevented his harm." *Lewis,* 155 N.J. at 560.[19]  On a motion for summary judgment, "if the proofs supporting the position of the non-moving party and the reasonable inferences drawn therefrom reveal a contested issue of fact regarding the practicality and feasibility of a proposed alternative design, the issue should be resolved by a jury." *Id.* at 568.[20]

Under an inadequate warning theory, a product is not reasonably safe if the manufacturer failed to act "in a reasonably prudent manner in providing the warnings given."

---

[19]  A plaintiff may also prevail on a design defect claim if he proves that "the risks involved in a product's use outweigh its utility even though there is no reasonably feasible alternative design." *Smith v. Keller Ladder Co.,* 275 N.J. Super. 280, 284 (App. Div. 1994); *see also Truchan v. Nissan Motor Corp.*, 316 N.J. Super. 554, 564 (App. Div. 1998)(quoting *Smith*).  Torres does not assert this type of design defect claim.

[20]  *Cf.* New Jersey Standard Civil Jury Instructions, 5.34C-3 ("You are to decide whether the safety benefits from altering the design as proposed by plaintiff were greater than the resulting costs or disadvantages caused by the proposed design, including any diminished usefulness or diminished safety.  If the failure to incorporate a practical and technically feasible safer alternative design made the product not reasonably safe, then the product was designed in a defective manner.  If, on the other hand, plaintiff has not proven there existed a practical and technically feasible alternative, or if you find that the product as designed was reasonably safe, then the product was not designed in a defective manner.").

*Feldman v. Lederle Lab.*, 97 N.J. 429, 451 (1984).

Disputed issues of material fact preclude summary judgment on either theory of liability.  With respect to the existence of a design defect, Torres has sustained his burden of putting forth what his expert concludes is a practical and feasible design alternative to the conveyor flights:

> The purpose of the cross slat or flight is to catch and pull the boards along the conveyor path.  Two posts or nubs, one on each conveyor chain across from each other, could have achieved this same objective. The posts would stay in alignment because the chain sprockets which index the chains are rigidly attached to the tail pulley shaft such that the chains move together.  The nubs would push on the board and move it along the conveyor table just as the cross slat flight does.  The board alignment would be defined and maintained by the pair of posts just as it is by the cross slat.  Without the cross slat or flight there is no cross member to create a shear or pinch hazard. The substitution of posts for the cross slat adds nothing to the cost of the conveyor.  Substitution of the posts for the slats eliminates the hazard without reducing the utility of the conveyor.

(Pl's Ex. I, Clauser Report at p. 4)  Oshikiri disputes the practicality and feasibility of this alternative design, citing the testimony of the Oshikiri engineer who originally designed the machine.  Mr. Kobayashi testified in some detail that the nub design would not work because the proposed nubs would lack the requisite strength to pull the boards.  (Kobayashi Dep. Tr. at p. 170)  Mr. Clauser disagrees, testifying that the nubs would provide the same forces as the flights.  (Clauser Dep. Tr. at p. 37)  It is apparent that a genuine dispute regarding the feasibility and practicality of the alternative design exists and

summary judgment must be denied.

Likewise, genuine disputes exist as to the adequacy of the warnings given.  Warning signs affixed to the machine in several places caution: "Danger Moving Machinery Keep Hands and Feet Clear."  (Oshikiri's Ex. S)  Oshikiri asserts these warnings were adequate while Mr. Clauser disagrees.  Mr. Clauser proposes that a warning, in the form of a pictogram, be placed directly in between the slat and the tail pulley shaft, to specifically identify the pinch / shear hazard.  (Clauser Dep. Tr. at p. 46, 114-16)  Thus, summary judgment must be denied.[21]

Lastly, with respect to both theories, Oshikiri repeatedly emphasizes that the record evidence suggests that Torres deliberately reached into the machine, thereby obviating its potential liability.[22]  However, as discussed *supra*, Torres testified specifically that he did not reach into the machine.

---

[21]  In opposition to Oshikiri's Motion for Summary Judgment, Torres also submits the report and testimony of Dr. Wilcox, a human factors consultant for design engineers.  In reply, Oshikiri essentially argues, citing New Jersey state law, that Dr. Wilcox is not qualified as an expert to testify about the issues in this case.  Because no formal motion in limine has been filed, and because the Federal Rules of Evidence, not New Jersey law, govern the issue, the Court will not rule on the qualifications of any expert at this time.

[22]  At oral argument, the Court questioned whether a factual determination that Torres intentionally reached into the machine would necessarily eliminate Oshikiri's liability.  *See Johansen v. Makita U.S.A.*, 128 N.J. 86, 98 (1992)(even knowing and voluntary encountering a risk "cannot serve as a basis for a contributory-negligence defense when an employee is injured in an industrial setting while using a defective product supplied by the employer for its intended or foreseeable purposes. . . . Because an industrial employee has no choice but to use the product to complete his or her assigned task, the law does not accept the employee's ability to take care of himself as an adequate safeguard of the interests society seeks to protect.")(internal quotations omitted).  Because of the disputed facts, the Court need not rule on the issue at this time.

Accordingly, disputed issues of fact preclude summary judgment. A jury may decide what happened.

**IV.**

For the foregoing reasons, the Court will grant Gemini's and Lucca's Bakery's Motions for Summary Judgment.  Oshikiri's Motion for Summary Judgment will be denied except that Oshikiri's Motion will be granted as to Counts II and IV (negligence and breach of implied warranties).  The Court will issue an appropriate order.

Date: May 22, 2007

                           __s/ Joseph E. Irenas_____

                           JOSEPH E. IRENAS, S.U.S.D.J.